**RAY-O-VAC**

v.

**CHICAGO & N. W. RY. CO.**

No. 2344.

United States District Court,
W. D. Wisconsin.

June 8, 1954.

Ralph E. Axley and Floyd A. Brynelson of the firm of Schubring, Ryan, Petersen & Sutherland, Madison, Wis., for plaintiff.

E. H. Borgelt of Quarles, Spence & Quarles, Milwaukee, Wis., Sam D. Parker, Kansas City, Mo., for defendant.

STONE, District Judge.

Findings of Fact

1. Plaintiff is a Wisconsin corporation with its general offices in Madison, Wisconsin, and is engaged in the manufacture and sale of dry batteries and flashlights.

Defendant is a Wisconsin corporation engaged in business as a common carrier by railroad.

The amount in controversy exceeds the sum of $3,000, and defendant's liability, if any, arises under the Uniform Bill of Lading, and presents a Federal question under the Interstate Commerce Act.

2. Car CB&Q–31908, containing 2368 cartons of dry, electric batteries, was delivered to defendant at Madison, Wisconsin, by plaintiff, July 5, 1951, for transportation to plaintiff at San Francisco, California, pursuant to the terms and provisions of the Uniform Straight Bill of Lading issued on that date by defendant; and said car was routed out of Madison, Wisconsin, over defendant's line to the Indiana Harbor Belt Railroad to Chicago, and thence to The Atchison, Topeka and Santa Fe Railway Company (hereinafter referred to as "Santa Fe") to San Francisco, California.

3. Said car was received by the Santa Fe from the connecting line at Chicago at 5:45 a. m., July 9, 1951, departed Chicago, 6:15 p. m., July 10, 1951, and arrived in the Santa Fe Argentine yard at Kansas City, Kansas, at 7:55 a. m., July 11, where it was inundated in the flood waters of the Kansas River on July 13, 1951. After arrival in the Argentine yard it was switched and put in a train for California.

4. The said shipment was rendered worthless as a result of said inundation in said flood waters and was dumped by agreement of the parties.

5. The shipment was of the value of $19,557.71, and plaintiff has duly filed its

claim with defendant and with the Santa Fe therefor as required by the bill of lading.

6. That defendant has heretofore refunded to plaintiff the sum of $1,273.51 for freight charges from Madison, Wisconsin, to San Francisco, California, and the amount sued for in plaintiff's complaint is reduced accordingly.

7. The Argentine district of Kansas City, Kansas, in which is located the Santa Fe Argentine yard, is adjacent to, and at the time of the July, 1951, flood, was protected from the Kansas River by a levee erected about 1912 by the Kaw Valley Drainage District, an agency created by the legislature of the State of Kansas for the purpose of constructing and maintaining said levee, and said levee was maintained by the Kaw Valley Drainage District and the United States Corps of Engineers. The levee was 35.5 feet above low water and ranged from 5 to 22½ feet above the level of the ground inside the levee. There was no levee protecting said Argentine yard in 1903, and after said levee was built, the said Argentine district had never been flooded prior to July 12, 1951.

8. While said car was en route from Chicago, the Marais des Cygnes River (not tributary to the Kansas) washed out the Santa Fe's tracks at points in Kansas approximately 60 miles west of Kansas City, Kansas, and the train in which plaintiff's car had been placed was unable to proceed to California because of said washouts.

9. At the time the car in question was received in the Santa Fe Argentine yard, the Kansas River was at a low stage (15.84 feet below the top of the levee); that thereafter the river rose and during the afternoon of July 11, 1951, it overflowed the Santa Fe tracks west of the Argentine yard (outside and west of the leveed area). At about noon, July 12, 1951, the river overflowed the tracks east of the Argentine yard (also outside and east of the leveed area) and by 2:00 p. m., upon said date, cut off all ingress and egress to or from the Santa Fe Argentine yard by rail.

10. The flood waters of the Kansas River overtopped the levee protecting the Argentine district of Kansas City, Kansas, at 11:50 p. m., July 12, 1951, at a point upstream from and adjacent to the Argentine Bridge, and covered the Santa Fe yard to depths ranging up to 22 feet.

11. The United States Weather Bureau issued no warning of the overtopping of the levee protecting the Argentine district of Kansas City, Kansas, but on the contrary the official forecasts, including the 6:00 to 9:00 p. m. forecast on July 12, the last one issued before the flooding of the Argentine area, were that the crest of the flood would be below the top of the levee.

12. That the United States Corps of Engineers issued no warning of the overtopping of the levee protecting the Argentine district of Kansas City, Kansas, but on the contrary issued assurances that the levee would not be overtopped.

13. That the Santa Fe relied on the river information and forecasts received from the Kaw Valley Drainage District, the United States Corps of Engineers, and the United States Weather Bureau that the levees protecting the Argentine district of Kansas City, Kansas, where the Santa Fe yard is located, would hold and not be overtopped.

14. The Santa Fe was not negligent in relying on the information released by, and the forecasts of, the Kaw Valley Drainage District, the United States Corps of Engineers and the United States Weather Bureau, that the levee protecting the Argentine district of Kansas City, Kansas, would hold and not be overtopped.

15. The July 12-13, 1951, flood of the Kansas River at Kansas City, Kansas (Argentine) was unusual, sudden, unforeseeable and extraordinary, and amounted in fact and in law to an act of God.

16. The total damage to the Argentine area of Kansas City, Kansas, from the July 1951 flood, as estimated by the

United States Corps of Engineers was $62,499,000.

The total damage to the Santa Fe Argentine yard from said flood was $5,901,000.

The damage sustained by the Santa Fe to movable property (exclusive of lading) consisting, among other items, of 32 diesel switch engines, 8 diesel road locomotives, 52 steam locomotives, and between 4500 and 5000 cars, was $2,144,356.00.

17. Defendant's connecting carrier, Santa Fe, had no knowledge or reason to believe that a flood threatened to overtop the levee protecting the Argentine district of Kansas City, Kansas, at any time prior to the actual overtopping of said levee, and was not negligent in relying on the information released by, and the forecasts of, the Kaw Valley Drainage District, the United States Corps of Engineers and the United States Weather Bureau, that the levee protecting the Argentine district of Kansas City, Kansas, would hold and not be overtopped, but on the contrary exercised reasonable care to protect plaintiff's shipment from loss or damage.

### Conclusions of Law

1. Plaintiff's rights and defendant's duties with respect to the transportation of said carload of batteries are governed by the terms of the Uniform Straight Bill of Lading.

2. Under the terms and conditions of the Uniform Bill of Lading the defendant is not liable for loss of, or damage to, the shipment in question, caused by an act of God unless its negligence proximately contributed to the loss, and the burden of proving such negligence is on the plaintiff.

3. The damage to plaintiff's shipment was proximately caused by an unusual, sudden, unforeseeable, extraordinary and devastating flood of the Kansas River amounting in fact and in law to an act of God, for which defendant is not liable, and was not due to negligence or human fault of defendant.

4. That defendant is entitled to judgment dismissing plaintiff's complaint, with costs.

Let Judgment be Entered Accordingly.